UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEORGE W. LOVAN,           )
                          )
        Plaintiff,        )
                          )
    v.                    )    Case No. 4:10CV1491 JCH/FRB
                          )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,        )
                          )
        Defendant.        )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is before the Court on plaintiff George W. Lovan's appeal of an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge for appropriate disposition pursuant to 28 U.S.C. § 636(b).

**I. Procedural History**

On May 18, 2009, plaintiff George W. Lovan ("plaintiff") protectively filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which he alleged disability beginning August 28, 2005.[1] (Administrative Transcript ("Tr.") 9). Upon initial consideration, the Social Security Administration denied plaintiff's claims for

---

[1]The Administrative Transcript does not contain copies of plaintiff's applications. However, in his opinion, the ALJ noted that plaintiff alleged disability beginning August 28, 2005, and neither party alleged error.

-1-

benefits. (Tr. 73-74, 83-90.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and a hearing was held on December 22, 2009. (Tr. 28-69). During the hearing, plaintiff testified and was represented by counsel. (Id.) On January 11, 2010, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 6-23).

On January 28, 2010, plaintiff requested review of the ALJ's hearing decision from defendant agency's Appeals Council, (Tr. 5), and on June 11, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

During the administrative hearing on December 22, 2009, plaintiff testified that he was born on June 17, 1979, was five feet, eleven inches tall, and weighed 260 pounds. (Tr. 39). He testified that he was single and had no children, and lived rent-free in a house with his mother and sister, and did not have a valid driver's license. (Tr. 39-40). Plaintiff testified that he had sold his car "four or five months ago" and lost his driver's license when he stopped paying insurance, and that a friend brought him to the hearing. (Tr. 40). The ALJ and plaintiff's counsel noted that the record contained a patrol officer's report of a traffic accident, which plaintiff's counsel stated occurred when plaintiff had a seizure. (Tr. 32).

Plaintiff testified that his weight had fluctuated between 220 and 260 during the past two years, but that he knew of no reason why. (Tr. 39). He testified that he once weighed nearly 400 pounds, but lost a lot of weight following his HIV diagnosis. (Id.)

Plaintiff completed "some college" but never earned a degree. (Tr. 40-41). He was never in the military. (Tr. 41). He completed some vocational training. He earned a culinary certificate which expired in September of 2009; a real estate license that expired in September of 2008; and a current license to sell insurance. (Id.) He testified that he was not currently working but that he did volunteer at his church food pantry. (Id.) He had not filed for unemployment compensation or workers' compensation, but received Medicaid and food stamps. (Tr. 41-42).

Plaintiff was last employed as an insurance agent, a job he held from September of 2008 until March of 2009. (Tr. 42-43). He stopped working because he "was no longer able to perform the task and duties required." (Tr. 42). Plaintiff testified that, in 2007, he "did real estate here and there," and lived with his mother at that time. (Tr. 43). In 2006, plaintiff was a restaurant worker at Jack in the Box and Jimmy John's. (Tr. 44). Plaintiff testified that he reported to work at Jimmy John's one day and was told "I'm tired of looking at you, get out." (Id.) He could not remember how his job at Jack in the Box ended. (Id.) In 2005, plaintiff worked at an Arby's restaurant as a shift manager, and left to attend culinary school. (Tr. 44-45). In 2004,

plaintiff worked for Courteous Communication as an answering service worker and telephone operator, which plaintiff described as a very stressful job. (Tr. 63-64). In 2003, plaintiff worked for a temp service, but could not remember the nature of the work. (Tr. 46). Plaintiff worked for Robert Half Corporation in 2002, but was not sure what duties he performed. (Tr. 46-47). Plaintiff's other past work included telephone operator, taxi cab dispatcher, gas station cashier, Wal-Mart stocker and cashier, and answering service worker. (Tr. 47-49).

Plaintiff testified that he was unable to work due to post-traumatic stress disorder (also "PTSD"), HIV, seizures, bipolar disorder, depression, obsessive compulsive disorder (also "OCD"), and a thyroid condition. (Tr. 49). Plaintiff explained that his conditions made him unable to "deal with people on a consistent basis," and caused him to be argumentative and fatigued. (Tr. 50). Plaintiff testified that he had "constant" headaches, that he was unable to compromise, and that he could not maintain focus. (Id.) He testified that he had constant flashbacks of traumatic events and was unable to move forward, and was also unable to work consistently or "move around all day the way that an employer would need me to." (Id.) Plaintiff testified that he had been suffering with these symptoms for "over five years" and that he had tried to work, and his symptoms were the reason he went from job to job. (Tr. 50). Plaintiff testified that, before his symptoms caused him to change jobs, he changed jobs often because he was "[t]rying to find something that fit me and my personality

-4-

where I could get along with people and find something that would pay me an amount where I could support myself." (Id.)

Plaintiff testified that he last used alcohol "four or five months ago." (Id.) He testified that he used marijuana three to four times per month, and testified that he did so to help him sleep. (Id.) When asked how he obtained so much marijuana without an income, plaintiff explained:

> I don't have many friends but the neighborhood that my parents stay in, I've grown up in this neighborhood my entire life. So I do have neighbors and different friends that I went to elementary school with, high school with that'll stop by just to check on me and see how I'm doing. And they oftentimes come by late in the evenings when they're getting off work and, hey, I stopped to see you, I've got something for you. And they come by, they'll bring me something.

> (Tr. 51).

When plaintiff's attorney asked him to explain his problems dealing with people, plaintiff testified that, in the work place, he became very combative with his bosses and with other employees; that he was an excellent manager; that he did not like for people to talk to him like he was stupid or like he was a child; and that he became "very argumentative and I snap." (Tr. 52). Plaintiff testified that he also had problems with being argumentative at home, and that he suffered "daily" problems getting along with people. (Id.) He testified that he had problems with fatigue, and that, as he sat there testifying, he felt as though he were "about to fall over." (Id.) Plaintiff testified that he spent the majority of his time in bed, and that

-5-

even though he may not "sleep the entire day" he stayed in bed. (Id.) Plaintiff testified that he suffered from headaches two to three times per week; that he was sometimes able to go to sleep to get rid of them; but that two days per week he would have a headache that lasted the entire day. (Tr. 53). Plaintiff testified that his mind drifted, and that, while working as an insurance salesman, he lost track of what he was supposed to do while talking to clients and did not follow proper protocol or procedures. (Tr. 54).

Plaintiff testified that he had suffered from PTSD since his teenage years, and that he experienced flashbacks on a daily basis. (Tr. 55-56). Plaintiff testified that his PTSD was triggered at age 13 by watching his father die of cancer. (Tr. 56). He testified that his flashbacks consisted of images including himself moving corpses from the water following Hurricane Katrina and his dead brother sitting next to him on the sofa. (Tr. 56-57). He testified that his functioning was affected because he saw his mother "constantly sitting in the same spot that my brother died in," and also saw reminders of his father's death and Hurricane Katrina. (Tr. 56-57).

Plaintiff testified that he had received mental health treatment on several occasions, and that medications helped somewhat. (Tr. 57). He stated that he had seizures one to three times per month, and described the seizures as "grand mal seizures with the convulsions" that lasted 30 to 90 minutes. (Id.) Plaintiff stated that he blacked out three times during the month

of November. (Id.) Plaintiff testified that he took Keppra[2] which decreased the frequency of his seizures. (Tr. 58).

Plaintiff was then asked to explain his thyroid condition. (Tr. 59). He testified that, when he visited his infectious disease doctors, a tumor was discovered in his throat area, and was subsequently surgically removed. (Id.) Plaintiff testified that he was told that the results of a biopsy showed the tumor to be malignant, but that he was told nothing else and underwent no further treatment. (Tr. 59-60). Plaintiff testified that, following the surgery, he "fell over and almost fractured a rib." (Tr. 60). He stated that, after the surgery, he had a blood clot in his leg that spread to his lungs, and was diagnosed with a pulmonary embolism from which he has not recovered. (Id.) He currently takes Lovenox[3] and Coumadin.[4] (Id.)

Plaintiff testified that he was diagnosed HIV positive in 2001 or 2002. (Id.) When asked whether he had any symptoms with regard to HIV, plaintiff testified that, back at that time, he believed he had full blown AIDS because he weighed nearly 400 pounds, was unable to eat for a month, and dropped from 390 pounds to 190 pounds. (Tr. 60-61). He has never been on anti-viral

---

[2]Keppra, or Levetiracetam, is used in combination with other medications to treat certain types of seizures in people with epilepsy. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699059.html

[3]Lovenox, or Enoxaparin, is used to prevent blood clots in the leg in patients who are on bedrest or who are having hip replacement, knee replacement, or stomach surgery. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html

[4]Coumadin, or Warfarin, is used to prevent blood clots from forming or from growing larger. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html

medication. (Tr. 61).

Plaintiff was asked to describe his symptoms due to obsessive compulsive disorder, and he stated that he was very set in his ways, that it is "my way or the highway." (Id.)

The ALJ then heard testimony from Stephen Dolan, a vocational expert ("VE"). The ALJ asked Mr. Dolan to assume an individual of plaintiff's age, education and work experience who was limited to work in the light exertional category that was simple, routine, and repetitive, and who must avoid the following: exposure to irritants such as fumes, odors, dust, gases and poorly ventilated areas; operational control, moving machinery, and working at unprotected heights or the use of hazardous machinery. (Tr. 64-65). The ALJ further specified that the individual should have only occasional interaction with the public, and could be around coworkers but not interact with them. (Tr. 65). The VE testified that such an individual could not perform plaintiff's past relevant work due to the limitation regarding interaction with the public. (Id.) The VE testified that there were jobs that such an individual could perform and that were available locally, such as housekeeper and cleaner, hand packager at the light level,[5] and mailroom clerk. (Id.)

The ALJ then asked the VE to assume that the individual just described was limited to jobs in which only occasional changes

---

[5] The VE testified that the Dictionary of Occupational Titles classified hand packaging jobs at the medium level, but that in the real work world, there exist hand packaging jobs at the light, medium and heavy exertional levels. (Tr. 67).

-8-

in work setting occur. (Tr. 66). The VE testified that this would not change his response to the first hypothetical question. (_Id._) The ALJ then asked the VE to further assume that the individual described "is to have no interaction with the public and there should be no changes in the work setting." (_Id._) The VE and the ALJ then had the following exchange:

Answer (by the VE): In terms of changes with the work setting that's, that's impossible to predict when there's going to be a change in the work setting. These are not jobs where there would typically be a lot of change but – –

Question (by the ALJ): Okay.

A: – – that's unforeseeable.

Q: Unforeseeable, okay. All right. Then if an individual that I just described however with only occasional changes in the work setting would also with no interaction with coworkers but again can be around them. No interaction with the public and the work is isolated to where he only has occasional supervision and what I mean by occasional supervision would be less than one-quarter of the day, of the workday.

A: The jobs that I cited in response to your first hypothetical would meet those restrictions, Your Honor.

(Tr. 66-67).

The ALJ then asked the VE to assume that the individual experienced severe fatigue and a multitude of other conditions as a result of multiple impairments, and asked how many absences per month would be tolerable and allow the individual to maintain employment. (_Id._) The VE testified that two absences would be the absolute limit. (_Id._) The ALJ then specified that the individual would require breaks in addition to customary breaks, and the VE testified that such an accommodation would eliminate all jobs. (_Id._)

Plaintiff's attorney asked the VE to assume the individual in the first hypothetical who would occasionally have difficulty maintaining regular attendance and performing the activities within a regular work schedule, and who would, up to a third of the workday, have difficulty performing at a consistent pace. (Tr. 67-68). The VE testified that such limitation would negatively impact those jobs, and that excessive absenteeism and the inability to consistently stick to tasks would not be tolerated. (Tr. 68). The hearing concluded with no request to hold the record open to allow the addition of any medical records or other evidence.

B.  <u>Medical Records</u>[6]

On February 12, 2003, plaintiff was seen in the Infectious Disease Division of the Department of Internal Medicine at Washington University (also "Washington University Clinic") for initial HIV care. (Tr. 685). Plaintiff reported having used Metabolife from 1998 to 2000, and losing a significant amount of weight. (<u>Id.</u>) Plaintiff reported smoking one pack of cigarettes per day, using marijuana, and using alcohol on the weekends. (<u>Id.</u>)

Plaintiff returned to the Washington University Clinic on April 9, 2003 for HIV follow-up. (Tr. 678). It was noted that plaintiff was using Metabolife supplements. (<u>Id.</u>) He returned on July 23, 2003 with complaints of low back pain and recurrent cysts, and right hip pain secondary to a bicycle accident. (Tr. 676).

---

[6]The following summary includes medical information pre-dating plaintiff's alleged onset date.

Plaintiff was diagnosed with a cyst on his tailbone, and excision was recommended. (Tr. 677). Radiological studies of plaintiff's right hip were also recommended. (Id.)

Records from Lakeside Alternatives, Inc., which is apparently a mental health facility in Florida, indicate that plaintiff was seen on July 6, 2005 on a voluntary basis seeking treatment for depression and anxiety. (Tr. 540). Plaintiff reported that he had been "going through a rough time lately," and described having experiencing a bad car accident that made him unable to go to work for one month, and subsequently losing that job. (Id.) Plaintiff also stated that he had argued with his live-in boyfriend, and now had nowhere to live. (Id.) Plaintiff reported smoking marijuana daily. (Tr. 541). He also admitted to trying cocaine, PCP, and Ecstasy. (Id.) Upon examination, it was noted that plaintiff had an appropriate and full range affect and smiled appropriately, and he was very pleasant, calm, and cooperative. (Tr. 543). His speech was coherent, his thoughts were organized, and his memory was intact. (Id.) Medications for depression, anxiety and insomnia were given. (Tr. 544). It was noted that although plaintiff was told to abstain from marijuana and join a substance abuse group, he did not appear motivated to do so. (Id.)

On July 10, 2005, plaintiff was seen again at Lakeside Alternatives. It was noted that he had been involuntarily admitted to Florida Hospital after taking a number of pills in an apparent suicide attempt. (Tr. 528). Plaintiff reported being under a lot

of stress due to homelessness, unemployment, and conflict with the family of a former sexual partner who discovered that plaintiff had withheld information concerning his HIV status. (Tr. 528). Plaintiff reported being "hyper sexual" and having mood swings and being impulsive, and also reported that he smoked marijuana and offered it free to men and could "get what he wants." (Id.) Plaintiff also discussed deaths in his family, stating that his aunt and grandmother had died within days of his 26th birthday. (Id.) It was noted that plaintiff had legal trouble, including citations for DUI, traffic offenses, and drug offenses. (Tr. 529). He admitted to using marijuana regularly, and trying Ecstasy. (Id.) Plaintiff was diagnosed with depression and HIV positive status, and admitted for evaluation and therapy. (Tr. 531). He was prescribed Paxil,[7] Restoril,[8] and Seroquel.[9]

Nearly one year later, on June 23, 2006, plaintiff was seen at the Washington University Clinic and reported that, during the preceding summer, he was diagnosed with depression, obsessive compulsive disorder, borderline personality disorder, anxiety, and sexual addiction. (Tr. 668). Plaintiff reported that he had moved to Florida for the past few years, but had returned to St. Louis at the end of April 2006, and had not had follow-up during that time.

---

[7]Paxil, or Paroxetine, is used to treat depression, panic disorder, and social anxiety disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698032.html

[8]Restoril, or Temazepam, is used on a temporary basis to treat insomnia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684003.html

[9]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

(Id.) Plaintiff was finishing his culinary degree, and was living with relatives. (Id.) Plaintiff reported that he smoked one to two packs of cigarettes per day, drank occasionally, and used marijuana daily. (Id.) It was noted that plaintiff had dental cavities, cysts, and a fungal infection on his toes. (Tr. 669).

Plaintiff returned to the Washington University Clinic on July 21, 2006 and reported doing reasonably well, but experiencing symptoms of anxiety and nervous mood, for which he was taking no medications. (Tr. 665). Plaintiff admitted to smoking one to two packs of cigarettes per day, and using marijuana daily. (Tr. 666). Plaintiff's assessment included generalized anxiety disorder, substance abuse, and conditions unrelated to the instant case. (Id.) Plaintiff returned on July 28, 2006 with exacerbation of complaints unrelated to the instant case. (Tr. 662). He again admitted daily marijuana use. (Id.) On August 25, 2006, plaintiff was seen for complaints unrelated to the instant case, and complaints of insomnia, low energy and anxiety. (Tr. 660).

Records from the Metropolitan St. Louis Psychiatric Center indicate that plaintiff was seen on September 15, 2006 and reported having been a victim of Hurricane Katrina. (Tr. 550-55). It was noted that plaintiff was "borderline" mentally ill. (Tr. 553). He was treated on an outpatient basis. (Tr. 554).

The record indicates that plaintiff was seen on a routine basis at the Washington University Clinic from March 26, 2007 to July 22, 2009 for follow up and assessment of issues related to his HIV status, and it was routinely noted that plaintiff's HIV was

-13-

well-controlled without antiretroviral (also "ARV") treatment. (Tr. 424-459). On March 26, 2007, plaintiff complained of a 30 pound weight gain, and other complaints unrelated to the instant case. (Tr. 458). Plaintiff reported that he was seeing a psychiatrist at St. Alexius who was a "quack" and did not help him. (Id.) Plaintiff was diagnosed with HIV/AIDS, folliculitis and fungal infection, and referred to alternative psychiatric care because he disliked his current psychiatrist. (Tr. 459). It was indicated that plaintiff was encouraged to find gainful employment, and to increase his exercise activity. (Id.) On August 27, 2007, plaintiff was noted to be doing well, and was advised to stop smoking. (Tr. 457).

Records from Barnes Jewish Hospital (also "BJH") indicate that plaintiff was seen on April 30, 2008 with complaints of "blacking out spells" that were increasing in frequency and duration. (Tr. 242). Plaintiff also reported that his muscles felt weaker and more tired over the last month. (Id.) Plaintiff reported taking Chantix,[10] Mirtazapine,[11] Invega,[12] Fluconazole,[13] and Lotrimin cream.[14] (Id.) He reported working as a realtor, and

---

[10]Chantix, or Varenicline, is used to help people stop smoking. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a606024.html

[11]Mirtazapine, also known as Remeron, is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697009.html

[12]Invega, or Paliperidone, is used to treat schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607005.html

[13]Fluconazole is used to treat fungal infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a690002.html

[14]Lotrimin cream is used to treat fungal infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682753.html

stated that he rarely used alcohol, smoked one to two packs of cigarettes per day, and occasionally used marijuana. (Id.) He stated that his mood had been down lately, and that he had begun seeing Dr. Arain at St. Alexis for depression, and was started on Remeron and Invega three months ago. (Tr. 242).

Upon examination, plaintiff had 5/5 strength in all muscles tested, intact sensation, and a steady gait. (Tr. 243). Dr. Jay Lieberman opined that plaintiff's description of his syncopal episodes were "most consistent with pseudoseizures." (Tr. 244). Dr. Lieberman told plaintiff that he had low concern for seizures or cardiogenic cause, and that the episodes were likely benign. (Id.) Dr. Lieberman also told plaintiff to discontinue taking Remeron and Invega because he did not feel that plaintiff needed them. (Id.) Dr. Lieberman suspected that plaintiff's syncopal episodes may be caused by sleep apnea. (Id.)

On May 13, 2008, plaintiff was seen at the Washington University Clinic, and reported three episodes of altered mental status, the first of which occurred six months ago when his mother found him to be sleep walking. (Tr. 451). The second occurred when he was driving, and he was observed to be drooling and unresponsive. (Id.) The third occurred while in church, where he was observed to rise from his seat, walk to the front of the church, and ask someone a nonsensical question. (Id.) It was opined that these episodes were pseudoseizures. (Tr. 453).

Plaintiff returned to BJH on June 23, 2008 with complaints of syncope, stating that he had "blacked out" while

-15-

driving due to intolerable pain in the left side of his mouth.
(Tr. 232, 236). He stated that he was told he needed a tooth
pulled, and that he had been taking Vicodin[15] and Advil for pain.
(Tr. 232-33). Upon examination, plaintiff was noted to be calm and
cooperative. (Tr. 232). It was noted that plaintiff smoked one
pack of cigarettes per day, and was told to quit. (Tr. 233, 236).
No barriers to learning were identified. (Id.) Dental cavities
and poor dentition were noted. (Tr. 237). Plaintiff was diagnosed
with a toothache, and was given a regional nerve block, and
Acetaminophen (Tylenol) and Oxycodone.[16] (Tr. 234, 238, 240).

An MRI of plaintiff's brain, performed on October 25,
2008 at BJH, was normal, with the exception of prominent
nasopharyngeal soft tissue, likely representing lymphoid
hyperplasia (an increase in the number of cells in the lymph
nodes). (Tr. 247).

Plaintiff presented to the Emergency Room of BJH on
December 9, 2008 with complaints of fever, chills, rash, sore
throat, perioral edema, headaches, and difficulty swallowing, and
was admitted to the hospital. (Tr. 265, 273). It was noted that,
while plaintiff had no known allergies before presenting to the
Emergency Room, it was discovered that he was allergic to several
medications. (Tr. 266). Plaintiff reported experiencing blackout

---

[15]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone,
and is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[16]Oxycodone is an opiate analgesic used to relieve moderate to severe
pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html

episodes since May of 2008. (Tr. 274). A CT scan revealed an enlarged lymph node on the right, but no acute lesions or stroke signals. (Tr. 266). Plaintiff was diagnosed with hypersensitivity syndrome, and was discharged with Keppra and a pain-relieving mouthwash, and was also given vitamin D and calcium. (Tr. 263, 267, 271, 275-76). He was discharged on December 12, 2008.

Plaintiff returned on December 13, 2008, stating that his allergic reaction had returned. (Tr. 259, 262). Plaintiff reported that, after he was discharged, he had "carried about his usual business, making a stop to the pharmacy, having a friend visit him, and then going to his mother's house, wherein, he had chosen to defer some food prepared by his mother for some commercially prepared mash potatoes and spinach." (Tr. 262). Plaintiff stated that, after consuming this, he began experiencing symptoms of an allergic reaction. (Id.) He stated that he had taken all of his medications, with the exception of Keppra, which he had forgotten. (Id.) It was noted that plaintiff responded to a therapy regimen that included Atarax,[17] Benadryl, Doxepin[18] and triamcinolone cream.[19] (Tr. 260). He was diagnosed with hypersensitivity syndrome. (Tr. 263). He was discharged on

_____

[17]Atarax, or Hydroxyzine, is used to relieve the itching caused by allergies, and to control the nausea and vomiting caused by various conditions including motion sickness.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682866.html

[18]Doxepin is used to treat depression and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682390.html

[19]Triamcinolone is used to treat the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions. It is also used to relieve the discomfort of mouth sores.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601124.html

December 15, 2008 in stable condition with prescriptions for Zyrtec,[20] Doxepin cream, Atarax, Keppra, Reglan,[21] Triamcinolone, Prednisone,[22] Bactrim-DS,[23] Benadryl and Lasix.[24] (Tr. 259-60).

Plaintiff returned to BJH on January 2, 2009 via ambulance with a report of having suffered a grand mal seizure and, while in the hospital, plaintiff was observed to suffer a second grand mal seizure in mid-conversation. (Tr. 277, 283). Plaintiff was admitted, and a lumbar puncture was performed, which revealed the presence of herpes simplex (HSV) DNA in the cerebrospinal fluid. (Tr. 285, 399, 404). A head CT was performed, which revealed no intracranial abnormality or hemorrhage, and was not significantly changed from the CT performed on December 9, 2008. (Tr. 379). A chest x-ray revealed a slight deviation of the trachea to the left, perhaps secondary to a goiter. (Tr. 378).

---

[20]Zyrtec, or Cetirizine, is used to treat the symptoms of seasonal allergies. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698026.html

[21]Reglan, or Metoclopramide, is used to relieve heartburn and speed the healing of ulcers and sores in the esophagus in people who have gastroesophageal reflux disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684035.html

[22]Prednisone is used to treat symptoms associated with low corticosteroid levels, and is also used to treat severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601102.html

[23]Bactrim, or Co-trimoxazole, is a combination of trimethoprim and sulfamethoxazole, a sulfa drug. It eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines. It also is used to treat "travelers' diarrhea." It is also prescribed for other purposes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684026.html

[24]Lasix, or Furosemide, is a 'water pill' that is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html

Records from Stanley Vriezelaar, M.D., indicate that plaintiff was seen on April 1, 2009 to establish care. (Tr. 249). It was noted that plaintiff had been diagnosed with HIV in 2001, with bipolar disorder in 2003, and with epilepsy in 2008; that he was obese, and that he suffered from "mild" sleep apnea. (Id.) Dr. Vriezelaar noted that plaintiff's bipolar disorder was "currently untreated." (Id.) Plaintiff reported smoking marijuana for his "nerves." (Id.) Upon examination, it was noted that plaintiff was obese, appropriately dressed, awake, and alert. (Tr. 249). Dr. Vriezelaar diagnosed plaintiff with epilepsy now treated with Keppra, obesity, cigarette smoking, HIV infection with low viral load and normal CD4 count, untreated bipolar disorder and marijuana use, and advised plaintiff to return in three months. (Id.)

On June 4, 2009, plaintiff underwent a neck ultrasound at BJH, which revealed diffuse enlargement of the right thyroid lobe with accompanying nodules, and fine needle aspiration was recommended. (Tr. 374).

On June 22, 2009, plaintiff returned to BJH for a scheduled admission for characterization of spells he had been having. (Tr. 255, 349). Plaintiff gave a history of experiencing spells during which he stared blankly ahead or became unresponsive, and stated that the spells had been occurring for approximately one year. (Id.) Plaintiff said that the spells occurred two to three times per month, and were sometimes preceded by a headache or anxiety. (Tr. 255). Plaintiff recounted an occasion in which he

was waiting in line at a local casino to check out of his hotel room, and was reportedly acting intoxicated, as if on drugs, for two hours. (Id.) On another occasion, he blacked out while driving with his sister as a passenger. (Tr. 256). Plaintiff admitted to "smoking cigarettes and has a 20 pack-year smoking history." (Tr. 257). Plaintiff admitted to daily marijuana use. (Id.) Plaintiff was admitted to the epilepsy monitoring unit of the hospital. (Tr. 258).

It was noted that the "etiology of [plaintiff's] spells was extremely varied," and that "[g]iven the nature of his spells as described, their prolonged length when they occur and the lack of response to antiepileptic drugs," plaintiff's spells "seem less likely to be of an epileptic nature." (Id.) Plaintiff underwent long-term video EEG monitoring, which revealed bitemporal epileptogenic potential, and mild bitemporal slowing, greater on the right, suggesting focal cerebral dysfunction. (Tr. 355). During plaintiff's hospital stay, none of the seizures or spells that plaintiff described occurred; however, because there were some abnormalities on previous EEG, plaintiff was given Keppra, and discharged in stable condition on June 26, 2009 and advised to follow up with his primary neurologist in the future. (Tr. 252-533).

On July 8, 2009, plaintiff arrived at the Emergency Room at BJH via ambulance, with complaints of numbness and bumps over his entire body, back pain, and profuse sweating and itching. (Tr. 368). The record indicates that plaintiff left prior to being seen

by a physician. (Tr. 371).

Also on July 8, 2009, plaintiff underwent a psychiatric evaluation at St. Louis University Hospital. (Tr. 409). The examiner noted that plaintiff had a blunted affect but an "ok" mood, good eye contact, fair insight and judgment. (Tr. 414). Plaintiff reported daily marijuana use. (Tr. 410). He performed normally on tests of orientation, memory, concentration, calculation, and language. (Tr. 414-15). The examiner diagnosed plaintiff with substance-induced mood disorder and marijuana abuse, and indicated that bipolar disorder should be ruled out. (Tr. 417). The examiner assessed plaintiff's Global Assessment of Functioning ("GAF") score as 70.[25] Plaintiff returned to Dr. Vriezelaar on July 20, 2009, who again noted that plaintiff had "currently untreated" bipolar disorder. (Tr. 421).

On July 22, 2009, plaintiff was seen at the Washington University Clinic and reported suffering multiple seizures, and it was noted that he was to have additional work-up. (Tr. 424).

On September 9, 2009, plaintiff underwent a psychiatric consultative evaluation with Summer Johnson, Psy.D. (Tr. 469-75). Plaintiff reported anxiety problems during the last ten years, and reported having seen his father die, experiencing a traumatic event as a child, and surviving Hurricane Katrina. (Tr. 469). Plaintiff

---

[25]A GAF score of 70 indicates some mild symptoms (such as depressed mood or insomnia) or some difficulty in social, occupational, and school functioning, but generally indicates good functioning and the existence of some meaningful interpersonal relationships. Sultan v. Barnhart, 368 F.3d 857, 859-860 (8th Cir. 2004).

reported that he had frequent reminders of the traumatic childhood event in his current neighborhood. (Id.) Plaintiff reported that he could not stand to be around people, and stated that he first reported problems with irritability during an inpatient psychiatric hospitalization while living in Florida in 2005, during which he reported severe mood swings and problems getting along with co-workers. (Tr. 470-71). Dr. Johnson noted that plaintiff was "sketchy" regarding his seizure history, but reported many incidents of blacking out while driving, and stated that they had caused him to lose his memory. (Tr. 470).

Plaintiff reported feeling depressed 23 hours daily, and stated that he had lost interest in church, working, and eating. (Id.) He reported insomnia and sleep apnea, and stated that he smoked marijuana to help him sleep. (Id.) He reported that, after smoking marijuana, he would sleep for 2 to 3 hours, be awake for about four hours, and then sleep for another few hours. (Id.) Plaintiff reported that, after five or six days of this pattern, he crashed, and slept the entire day away. (Tr. 470). He reported that his marijuana use was "nightly" if he had funds available. (Id.) Plaintiff indicated that he was scheduled to have surgery related to a thyroid disorder and was convinced that he had thyroid cancer, but Dr. Johnson noted that the medical records did not confirm a cancer diagnosis. (Tr. 471). Plaintiff reported that he last worked in March of 2009, and had difficulty continuing the work because of the amount of driving it required. (Tr. 471-72). Plaintiff also reported having parking and traffic tickets, and

being cited for DWI. (Tr. 472). Dr. Johnson also noted that plaintiff "has a case pending for interfering with the duty of an officer and was recently held in contempt of court for making an inappropriate comment toward a judge." (Tr. 472).

Upon examination, Dr. Johnson noted that plaintiff was able to engage with her and provide coherent and logical information, but that he tended to be guarded and defensive. (<u>Id.</u>) Dr. Johnson noted no difficulties with expressive or receptive language, and no evidence of tangents, flight of ideas, or perseveration. (<u>Id.</u>) Dr. Johnson noted that plaintiff's affect was irritated, and that plaintiff described his mood as edgy and irritable. (<u>Id.</u>) Dr. Johnson noted no evidence of preoccupations, thought disturbances, perceptual distortions, delusions, or hallucinations, but that there appeared to be some suggestion of suicidal and homicidal ideation. (Tr. 472). Dr. Johnson noted that plaintiff overall had good to fair performance on testing. (Tr. 473).

Dr. Johnson administered the "TOMM," a test designed to assess malingering, and discovered that plaintiff's performance suggested that he did not put forth maximum effort and, because of these test results, malingering should be considered a possibility. (<u>Id.</u>)

Plaintiff indicated that he lived with his mother and sister; that his cousin frequently visited; that he paid his own bills; and completed many of the household chores. (Tr. 473-74). Plaintiff denied any changes in his ability to perform his

activities of daily living, and denied any problems in his ability to care for his personal needs.  (Tr. 474).

Dr. Johnson noted that, while plaintiff reported that his blackouts were leading to large portions of his memory being erased, his TOMM results suggested that plaintiff was likely "not being up front with regard to his memory impairment and may have memory functioning that is much better than what he indicates." (Tr. 475).  Dr. Johnson noted that, overall, there appeared to be evidence of a mood disorder with moderately to severely impaired social and occupational functioning. (<u>Id.</u>) Dr. Johnson noted that plaintiff's prognosis was fair with appropriate intervention. (<u>Id.</u>)

On October 8, 2009, Kyle DeVore, Ph.D. completed a Psychiatric Review Technique form.  (Tr. 476-88).  Dr. DeVore indicated that plaintiff was bipolar and had PTSD and histrionic personality features, and chronic cannabis abuse.  (<u>Id.</u>)  Dr. DeVore opined that plaintiff had mild limitations in his activities of daily living and in maintaining concentration, persistence or pace, and a moderate limitation in maintaining social functioning. (Tr. 484).

Dr. DeVore wrote that plaintiff's mother reported that plaintiff "[c]an follow instructions when feels like it;" that he had three motor vehicle accidents due to seizures; and that he either slept too much or too little. (Tr. 486).  It was noted that plaintiff smoked one to two packs of cigarettes per day.  (<u>Id.</u>)

Dr. DeVore determined that plaintiff was moderately

limited in his ability to work in coordination with or proximity to others without being distracted; interact with the public; accept and respond appropriately to criticism; get along with coworkers; and maintain socially appropriate behavior. (Tr. 489-90). Dr. DeVore determined that plaintiff was not significantly limited in any other area of functioning. (Id.)

Also on October 8, 2009, a Physical Residual Functional Capacity Assessment was completed by Angela R. Bennett. (Tr. 492 - 98). Ms. Bennett determined that plaintiff could occasionally lift 20 pounds and frequently lift 10; stand, walk and sit for six hours in an eight-hour day; and push and/or pull without limitation. (Tr. 493). Ms. Bennett noted that plaintiff had complex partial epilepsy with no evidence of neurological deficits. (Id.) Ms. Bennett determined that plaintiff had no postural, manipulative, visual, or communicative limitations. (Tr. 494-96). Ms. Bennett opined that plaintiff should avoid concentrated exposure to environmental factors such as fumes, odors, dusts, and gases, etc., and should avoid even moderate exposure to hazards such as machinery and heights. (Tr. 496).

On August 6, 2009, plaintiff was seen by William E. Gillanders, M.D., for evaluation of a right thyroid nodule. (Tr. 556). Plaintiff was not currently taking any medications. (Id.) It was noted that fine needle aspiration data was suspicious for malignancy. (Tr. 557). Dr. Gillanders recommended right thyroidectomy, (Id.), which he performed at BJH on September 15, 2009. (Tr. 564-65).

On October 22, 2009, a chest CT revealed a pulmonary embolism and left lower extremity deep venous thrombosis, and was admitted briefly to BJH. (Tr. 574, 585). Plaintiff was treated with Heparin[26] and Lovenox,[27] and discharged on Lovenox, Coumadin, Topamax,[28] and Keppra, and instructed to follow up at the infectious disease clinic for regular checkups. (Id.)

On October 28, 2009, plaintiff was seen in the Washington University Clinic with complaints of left calf swelling and pain, and stated that he went to the Emergency Room but left before being seen. (Tr. 597). Plaintiff stated that he was given a prescription for Lovenox, but has not taken it. (Id.) Plaintiff reported shortness of breath with exertion and left sided chest pain. He denied neurological symptoms, weakness, or numbness. (Id.) Plaintiff reported exacerbation of his depression. (Id.) The assessment was deep venous thrombosis and pulmonary embolism, and plaintiff was instructed in how to use Lovenox. (Tr. 598).

On December 2, 2009, William Maurice Redden, M.D., completed a Mental Impairment Questionnaire, which is addressed at

---

[26]Heparin is used to prevent blood clots from forming in people who have certain medical conditions or who are undergoing certain medical procedures that increase the chance that clots will form. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682826.html

[27]Lovenox, or Enoxaparin, is used to prevent blood clots in the leg in patients who are on bedrest or who are having certain surgical procedures. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html

[28]Topamax, or Topiramate, is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used to prevent migraine headaches. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

the top to "Amy at Sherri Allen's office."[29]   (Tr. 687).   Therein,

Dr. Redden diagnosed plaintiff with bipolar disorder, obsessive

compulsive disorder and PTSD, and seizure disorder.   (Id.)   Dr.

Redden indicated, via check marks, that plaintiff suffered from

poor memory, appetite disturbance, personality change, mood

disturbance, social withdrawal, emotional lability, manic syndrome,

intrusive recollections of a traumatic experience, persistent

irrational fears, and generalized persistent anxiety.   (Tr. 687-

88).   For his clinical findings demonstrating the severity of

plaintiff's impairments, Dr. Redden wrote:

> He mood [sic] is normally irritable with
> expansive [illegible] affect.   Thought
> processes generally logically [sic] but can be
> easily distorted.   Speech showed increasing
> rate.   [Illegible] general anxiety that
> increases when he has some flashbacks.

(Tr. 688).

Dr. Redden indicated, via a check mark and without

elaboration, that plaintiff was not malingerer.   (Id.)   Dr. Redden

opined that plaintiff had a "fair" ability to remember work-like

procedures, understand and remember very short and simple

instructions, carry out very short and simple instructions, make

simple work-related decisions, ask simple questions or request

assistance, and be aware of normal hazards and take appropriate

precautions.   (Tr. 690-91).   Dr. Redden indicated that plaintiff

had poor to no ability to perform all other work-related functions.

(Id.)   Dr. Redden indicated that plaintiff's limitations were due

---

[29]Sherri Allen served as plaintiff's attorney during his administrative
hearing.

to his bipolar condition and seizure disorder, and to the "[illegible] impact from HIV." (Tr. 691). Next, Dr. Redden indicated that plaintiff had "fair" limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, adhere to basic standards of neatness and cleanliness, and use public transportation. (Tr. 692). Dr. Redden indicated that plaintiff had poor to no ability to deal with the stress of semiskilled and skilled work, interact appropriately with the public, maintain socially appropriate behavior, and travel in unfamiliar places. (Id.) Dr. Redden indicated that plaintiff had "marked" restrictions in his activities of daily living and maintaining social functioning; "frequent" deficiencies of concentration, persistence or pace; and "continual" episodes of deterioration or decompensation in work or work-like settings. (Tr. 693).

### III.   The ALJ's Decision

The ALJ in this case determined that plaintiff met the insured status requirements through September 30, 2011. (Tr. 11). The ALJ determined that plaintiff had engaged in substantial gainful activity in October and November of 2008. (Id.) In making this finding, the ALJ noted the reporting of plaintiff's earnings, and wrote that plaintiff did not provide "persuasive evidence that the work performed was not worth the earnings received," and did not provide persuasive evidence that he "ceased work due to any impairment related limitations." (Id.) The ALJ wrote that the

record did not "regularly confirm a medically determinable impairment with respect to [plaintiff's] alleged spells," and did not "document that work ceased due to a need for special conditions or assistance that were not provided." (Tr. 11-12). The ALJ wrote that plaintiff had failed to meet his burden "of establishing that he was not engaging in substantial gainful activity in November and December 2008 and that the earnings were the result of an unsuccessful work attempt." (Tr. 12). The ALJ concluded that plaintiff was not disabled in November and December of 2008, and continued to consider whether plaintiff was disabled prior to November 2008, and subsequent to December 2008. (Id.) The ALJ wrote that, even if plaintiff had not engaged "in substantial gainful activity in the above months, [plaintiff] has not been disabled since the alleged onset date." (Id.)

The ALJ determined that plaintiff was HIV positive, and had bipolar disorder, a post-traumatic stress disorder, a seizure disorder, chronic fatigue syndrome, an obsessive compulsive disorder, and a thyroid nodule. (Id.) The ALJ determined that plaintiff's impairments were severe in combination, but that he did not have an impairment or combination of impairments of listing-level severity. (Tr. 12).

The ALJ determined that plaintiff was unable to perform his past relevant work, but had the residual functional capacity (also "RFC") to perform the full range of light work, except that he: must avoid concentrated exposure to irritants and all exposure to operational control of moving machinery; must not work at

-29-

unprotected heights or around hazardous machinery; must perform work that involves only simple, routine and repetitive tasks with no changes in the work setting. (Tr. 13). The ALJ also determined that plaintiff could work around coworkers but not interact with them, and could not interact with the public. (Id.) The ALJ wrote that, in making his finding, he had considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence in accord with 20 C.F.R. §§ 404.1529 and 416.929; addressed each of plaintiff's allegations in turn; and concluded that the facts of record undermined plaintiff's credibility. (Tr. 13-18). The ALJ concluded that plaintiff's obesity, HIV, obstructive sleep apnea, nodular hyperplasia and headaches have not been severe impairments, singularly or in combination, since the alleged onset date, and that plaintiff had failed to meet his burden of establishing otherwise. (Tr. 16). Noting the VE's testimony, the ALJ determined that, considering plaintiff's age, education, work experience, and residual functional capacity, plaintiff had acquired job skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. (Tr. 22). The ALJ concluded that plaintiff was not under a disability from August 28, 2005 through the date of the decision. (Id.)

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v.

<u>Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart

P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled. Finally, at the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the plaintiff's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be found to be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

In the case at bar, plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as

-33-

a whole because he failed to afford the proper weight to the opinion Dr. Redden expressed in his Mental Impairment Questionnaire. Plaintiff also argues that the ALJ's decision and the VE testimony are inconsistent with each other and with the DOT. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole. Review of the decision reveals no error.

A.    Dr. Redden's Mental Impairment Questionnaire

Characterizing Dr. Redden as a treating physician, plaintiff argues that the ALJ improperly assigned little weight to Dr. Redden's opinion, and that Dr. Redden's opinion was consistent with the record as a whole. Plaintiff contends that Dr. Redden assessed plaintiff's GAF at 45, and that his opinion was therefore consistent with that of Dr. Johnson, who assessed a GAF of 50. Plaintiff argues that Dr. Redden listed "many signs and symptoms" supporting his opinion, inasmuch as he listed "poor memory, appetite disturbance with weight change, personality change, mood disturbance, social withdrawal or isolation, emotional lability, manic syndrome, intrusive recollections of a traumatic experience, persistent irrational fears and generalized persistent anxiety, irritable mood, easily distracted, speech showed increased rate and describes flashbacks." (Docket No. 11 at 9-10). Plaintiff notes that the record reflects diagnoses of depression and bipolar disorder, and concludes that Dr. Redden does therefore "cite objective findings and clinical observations to support his opinion." (Id. at 10). Plaintiff also contends that the ALJ

erroneously applied Dr. Johnson's diagnosis of malingering to her entire report, when it is clear that such diagnosis applied only to the memory test Dr. Johnson administered. Plaintiff suggests that the ALJ failed to consider the appropriate factors in discounting Dr. Redden's opinion, and engaged in medical conjecture.

As an initial note, there is at least some question whether Dr. Redden can correctly be characterized as a "treating physician," as plaintiff contends.

The Regulations define a "treating source" as an acceptable medical source

> who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source <u>when the medical evidence establishes</u> that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). . . . We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.

20 C.F.R. §§ 404.1502, 416.902 (emphasis added).

Greater weight will be given to a treating source who has seen the claimant "a number of times and long enough to obtain a longitudinal picture" of the claimant's impairment. 20 C.F.R. §§ 1527(d)(2)(i) and 416.927(d)(2)(i). This rule is premised, at least in part, on the concept that a physician with a longstanding treatment relationship with the claimant is more familiar with a

claimant's condition than are other physicians.   Thomas v. Sullivan, 928 F.2d 255, 259 n. 3 (8th Cir. 1991).

In the case at bar, the record contains no medical treatment records from Dr. Redden, and instead contains only the record of the December 2, 2009 Mental Impairment Questionnaire, addressed to plaintiff's then-attorney.   Therein, Dr. Redden indicates that his relationship with plaintiff consisted of "monthly on average for 60 min initial with + 30 mins for [follow-up] visits." (Tr. 687).   Dr. Redden does not, however, offer any relevant dates, indicate how many times he saw plaintiff, attach copies of treatment notes, or any other information relevant to the nature of his relationship with plaintiff.   In his brief, despite repeatedly characterizing Dr. Redden as a treating physician and strenuously arguing that the ALJ failed to give Dr. Redden's opinion the deference it was due as the opinion of a treating source, plaintiff notes only this December 2, 2009 Questionnaire, and makes no attempt to explain the lack of medical treatment records from Dr. Redden, or address the issue surrounding Dr. Redden's status as a treating physician.   Similarly, during plaintiff's administrative hearing, plaintiff's counsel failed to call attention to the lack of treatment records from Dr. Redden, and failed to ask that the record be held open following the hearing to obtain such records.   Finally, the Commissioner, in reply to plaintiff's brief, noted the lack of medical records from Dr. Redden and the lack of clarity regarding plaintiff's treatment relationship with Dr. Redden, but plaintiff offered no response.

As noted above, according to the Regulations, Dr. Redden could be defined as a treating source if he was providing, or had provided, plaintiff with medical treatment or evaluation, <u>and</u> if he had an ongoing treatment relationship with plaintiff. 20 C.F.R. §§ 404.1502, 416.902. Dr. Redden will be considered to have had an ongoing treatment relationship with plaintiff <u>if the medical evidence establishes</u> that plaintiff saw or had seen Dr. Redden with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for plaintiff's condition(s). <u>Id.</u> The medical evidence in the case at bar does not so establish. As discussed above, the record contains no treatment records from Dr. Redden tending to establish the existence of an ongoing treatment relationship with plaintiff. Furthermore, as the Commissioner correctly notes, in April and July of 2009, Dr. Vriezelaar noted that plaintiff's bipolar disorder was "currently untreated," which suggests that, even if Dr. Redden did have a treatment relationship with plaintiff, it did not begin until much later in the relevant time period. The undersigned therefore concludes that Dr. Redden does not meet the Regulations' definition of a treating source, and the opinion expressed in his Questionnaire was therefore not entitled to the deference given treating sources.

However, assuming, <u>arguendo</u>, that the record supports plaintiff's characterization of Dr. Redden as a treating source, the undersigned finds that the ALJ properly analyzed Dr. Redden's opinion and gave legally sufficient reasons for affording it less

weight.

The Eighth Circuit has recognized that, while a treating physician's opinion is "generally entitled to substantial weight," it "does not automatically control in the face of other credible evidence on the record that detracts from that opinion." Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Id. at 879. When deciding the weight to afford a treating physician's opinion, an ALJ must consider factors such as the length of the treatment relationship, and the frequency of the examinations. Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). An ALJ may justifiably discount a treating physician's opinion when it is inconsistent with his or her own treatment notes, and/or inconsistent or contrary to the medical evidence as a whole. Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation and citation omitted). When an ALJ discounts a treating physician's opinion, he or she should give good reasons for doing so. Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000).

In his written opinion, the ALJ exhaustively analyzed all of the medical evidence of record, including Dr. Redden's Questionnaire and Dr. Johnson's report, and fully explained the reasons for his decision to discount Dr. Redden's opinion. He

noted that Dr. Redden's statement contained no citations to any of his medical findings or clinical observations that would support the limitations he reported, and that Dr. Redden's findings, including that plaintiff was not malingering, appeared to be unsupported by the objective medical findings contained within Dr. Johnson's report, and the remainder of the record as a whole. (Tr. 20). The ALJ noted that the "objective medical findings, and diagnostic test results indicating malingering, indicate the absence of a severe mental impairment or severe combination of impairments." (Id.) The ALJ wrote that he was giving little weight to Dr. Redden's statement, and greater weight to the remainder of the record. The ALJ acknowledged that "[t]he record must be evaluated in its entirety," and wrote that he was unwilling "to treat the medical records as a collection of separate findings, from which certain items can be selected at the expense of other items conveniently left out." (Tr. 20). Regarding Dr. Johnson's report, the ALJ wrote that he would not ignore the finding of malingering on one hand, and accept the GAF score of 50 on the other hand, without reasonable consideration. The ALJ wrote that he had considered the GAF of 50 as given by Dr. Johnson, and the statement of Dr. Redden, and had given them due weight, but had accorded greater weight to the remainder of the record.

Substantial evidence supports the ALJ's decision in this regard. As the Commissioner notes, while the record contains evidence of psychiatric hospitalizations before plaintiff's alleged

onset date, the record contains no evidence of such hospitalizations after. (Tr. 528, 536). Seeking limited medical treatment is inconsistent with a claim of total disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (the claimant's failure to seek treatment for medical and psychiatric condition contradicted allegations of a disabling condition). In addition, when plaintiff was seen at the Metropolitan St. Louis Psychiatric Center in September of 2006, it was opined that he was merely "borderline" mentally ill. (Tr. 553). When plaintiff was seen at the Washington University Clinic in March of 2007, he was encouraged to secure gainful employment and to exercise. On July 8, 2009, when plaintiff underwent a psychiatric evaluation at St. Louis University Hospital, he performed normally on tests of orientation, memory, concentration, calculation, and language. While Dr. Redden opined that plaintiff had marked restrictions in his activities of daily living and social functioning, Dr. Johnson noted that plaintiff himself reported that he paid his own bills and completed "many of the household chores;" "denied any changes in his ability to perform his activities of daily living;" and denied any problems caring for his personal needs. (Tr. 473-74). Dr. Redden's opinion that plaintiff had poor memory is directly contradicted by the results of the TOMM administered by Dr. Johnson. Dr. Redden's opinion that plaintiff was not a malingerer (indicated via a check mark in a box and apparently unsupported by

diagnostic testing) is directly contradictory to Dr. Johnson's diagnosis of malingering (diagnosed after administering the TOMM and fully explained in her report). Furthermore, during his administrative hearing, plaintiff testified that he volunteered at his church's food pantry, and also testified that he was regularly visited by friends who brought him marijuana, and plaintiff also reported substantial work activity during the relevant time period. As the ALJ properly concluded, Dr. Redden's opinion was inconsistent with the record as a whole, and the ALJ was justified in discounting it. See Halverson, 600 F.3d at 929-30 (When a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less than controlling weight).

Plaintiff argues that the ALJ erred by indicating that Dr. Redden failed to cite objective findings and clinical observations supporting the reported limitations, and suggests that his diagnoses of depression and bipolar disorder are objective findings, and that Dr. Redden checked boxes indicating several signs and symptoms supporting his findings. Plaintiff's argument is meritless. As the Commissioner correctly notes, the mere fact that Dr. Redden wrote down diagnoses and checked boxes indicating symptoms is insufficient to entitle his opinion to significant weight. A treating physician's opinion is afforded significant weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Singh v. Apfel, 222 F.3d

448, 452 (8th Cir. 2000). Dr. Redden's is not. As discussed above, the Administrative Transcript contains no treatment notes from Dr. Redden, and Dr. Redden made no attempt, in his Questionnaire, to inform the reader of the technique he used to reach his conclusions. Regarding Dr. Redden's checkmarks indicating a plethora of symptoms, even if Dr. Redden could properly be considered a treating source, a treating physician's checkmarks on a questionnaire are conclusory opinions that may be discounted if, as in this case, they are contradicted by other objective medical evidence in the record. See Stormo v. Barnhart, 377 F.3d 801, 805- 06 (8th Cir. 2004); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001); see also Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (noting the limited probative value of a "checklist" RFC assessment); see also Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) (It is appropriate to disregard statements of opinion by a treating physician that "consist[s] of nothing more than vague, conclusory statements.")

Plaintiff also contends that the ALJ erroneously applied Dr. Johnson's diagnosis of malingering to her entire report, when he should have applied it only to her findings regarding plaintiff's memory. Plaintiff's argument is unavailing.

Regarding Dr. Johnson's report of plaintiff's performance on the TOMM, her observation that plaintiff was exaggerating his symptoms, and her diagnosis of malingering, the ALJ wrote as follows:

. . . it is very significant that Dr. Johnson also reported that TOMM testing indicated the possibility of malingering.  It was also felt that the claimant's memory was likely much better than he indicated.  Further, Dr. Johnson's examination revealed normal motor activity, a normal gait and posture, good eye contact, spontaneous conversation, logical and coherent conversation and only a slight push of speech. The claimant had no difficulties with expressive or receptive language and exhibited no tangential thoughts or flights of ideas.  Although reported with "some suggestion" of suicidal and homicidal ideation (apparently by statements only), there was not actual evidence of thought disturbance, perceptual distortion or delusions.  Finally, malingering was amongst the diagnoses.

The above facts, the diagnosis of malingering, the TOMM test results and the objective medical findings undermine the claimant's credibility regarding severe and disabling mental impairments.  The diagnosis of malingering severely detracts from the claimant's credibility with respect to allegations of disabling mental and physical impairments.

(Tr. 18).

Given Dr. Johnson's observation that plaintiff's TOMM results suggested that he was malingering, and was likely "not being up front with regard to his memory impairment and may have memory functioning that is much better than what he indicates," the ALJ was entitled to draw the above conclusions about the credibility of plaintiff's complaints, inasmuch as evidence of malingering effectively casts suspicion on plaintiff's motivations and credibility.  See Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) (the ALJ was entitled to draw conclusions about the

claimant's credibility based on doctor's observation of the claimant's "probable dramatic exaggeration of anxiety," indicating that the claimant was exaggerating symptoms); see also Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006) (citing Clay v. Barnhart, 417 F.3d 922, 930 n. 2 (8th Cir. 2005) (noting that the findings of two psychologists that the claimant was "malingering" on her I.Q. tests cast suspicion on the claimant's motivations and credibility)); O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003) (An ALJ may discount a claimant's allegations if there is evidence that he is a malingerer or was exaggerating symptoms for financial gain); Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (a physician's observation "of the discrepancies in [the claimant's] appearance in the examining room and those outside when he did not know that he was observed" supported the ALJ's finding that the claimant's complaints were not fully credible)). Nothing in the foregoing cases suggests that the ALJ is restricted to considering only those symptoms or conditions regarding which a claimant is caught malingering; rather, the emphasis appears to be on the claimant's motivations and credibility in general. Furthermore, Dr. Johnson's diagnosis of malingering was not the only basis for the ALJ's decision to discredit plaintiff's allegations of disabling mental symptoms. Plaintiff does not challenge the ALJ's credibility determination in general, but instead limits his argument to the breadth of the ALJ's consideration of Dr. Johnson's observation of malingering. Even

so, the undersigned has reviewed the record and the ALJ's decision, and notes that the ALJ in this case made a legally sufficient credibility determination that was based upon the record as a whole, not just upon Dr. Johnson's report of the results of plaintiff's TOMM, her observation that plaintiff was exaggerating his symptoms, and her diagnosis of malingering. The ALJ in this case noted that the record documented "nearly continuous use of [unprescribed] marijuana" by plaintiff since the alleged onset date, which did "not enhance his credibility." (Tr. 20). The ALJ also noted that plaintiff had applied for benefits on other occasions, and appeared to be benefit-motivated. (Id.) While not alone dispositive, these are factors that the ALJ was entitled to consider.

Furthermore, plaintiff's argument concerning the GAF scores assigned by Drs. Redden and Johnson is unavailing. While a GAF score may be of some assistance, it is not essential to determining a claimant's RFC. Jones, 619 F.3d at 973 (citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)). In addition, as the Jones Court recognized, the Commissioner "has declined to endorse" GAF scores for use in its disability programs, and has indicated that GAF scores are not directly correlated to the severity requirements of the mental disorders listings. Id. at 973-74 (internal quotations and citations omitted). Furthermore, Dr. Johnson's assessment of a 50 GAF is undercut by her interpretation of plaintiff's positive TOMM results showing that

plaintiff was a malingerer, and her diagnosis of malingering. As indicated above, the ALJ specifically addressed this situation and explained his reasoning, writing that he was reluctant to ignore the finding of malingering on one hand and accept the GAF score of 50 on the other without reasonable consideration. (Tr. 20). The ALJ wrote that he had considered the GAF scores of Drs. Johnson and Redden and had given them "due weight," but decided to give greater weight to the remainder of the record. (Id.) Substantial evidence supports the ALJ's decision. See Jones, 619 F.3d at 974 (physician's assessment of a 50 GAF was undercut by his prior comments about the claimant's "probable dramatic exaggeration of anxiety.")

Despite plaintiff's arguments that the ALJ failed to follow the treating physician rule, the undersigned determines that the ALJ gave proper consideration to the treatment relationship between Dr. Redden and plaintiff, and properly discounted Dr. Redden's opinion after undertaking the proper analysis. Furthermore, plaintiff's suggestion that the ALJ engaged in medical conjecture is wholly without merit. As discussed above, the ALJ exhaustively analyzed all of the medical evidence of record and fully discussed his reasons for deciding as he did, and his decision is supported by Dr. Johnson's opinion, by the opinion of the state agency psychological consultant, and by the record as a whole.

B.    VE Testimony

Plaintiff next argues that the ALJ's decision and the VE's testimony are inconsistent with each other. Plaintiff notes that the ALJ included a limitation to "no changes in the work setting" even though, in response to a hypothetical specifying no changes in work setting, the VE testified that it was impossible to predict when there would be a change in the work setting, and that such was unforeseeable. Plaintiff argues that the ALJ failed to seek clarification from the VE on this point, and yet restricted plaintiff to work involving no changes in the work setting, and his decision is therefore inconsistent with the VE's testimony. In response, the Commissioner argues that the ALJ's finding appears to indicate an inability to tolerate significant changes, noting the state agency psychological consultant's opinion that plaintiff was not significantly limited in the ability to respond to changes in the work setting. The Commissioner also notes that the VE testified that a limitation to occasional changes in the work setting would not preclude the jobs he identified, and that workplace changes were unlikely in the identified jobs.

As noted above, during plaintiff's administrative hearing, the ALJ presented separate hypothetical questions to the VE that included factors related to changes in the work setting. Initially, the ALJ asked the VE to consider a person who was "limited to jobs that only occasional changes in work setting occur," and the VE testified that such a restriction would not preclude jobs such as housekeeping/cleaner, hand packaging, and

mailroom clerk. (Tr. 65-66). The ALJ subsequently altered the hypothetical to provide that "there should be no changes in the work setting." (Tr. 66). In response, the VE testified that, while the jobs he previously identified typically did not involve a lot of change, it was "impossible to predict when there's going to be a change in the work setting," and that such was "unforeseeable," and the ALJ acknowledged that testimony. (Id.)

> Even so, for his RFC finding, the ALJ wrote:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant must avoid concentrated exposure to irritants and all exposure to operational control of moving machinery. The claimant must not work at unprotected heights or around hazardous machinery. The claimant must perform work that involves only simple, routine and repetitive tasks <u>with no changes</u> in the work setting. The claimant cannot have interaction with the public. The claimant can work around others but must avoid interaction with them.
>
> (Tr. 13) (emphasis added).

Later in his opinion, the ALJ again specified that there should be "no changes" in the work setting, and specifically: "[t]herefore, the claimant must perform work that involves only simple, routine and repetitive tasks <u>with no changes</u> in the work setting." (Tr. 21) (emphasis added). The ALJ then noted the VE's testimony that representative occupations such as housekeeper/cleaner, hand packager, and mail room clerk could be performed by a person with the same age, education, past relevant

work experience, and residual functional capacity as plaintiff, and concluded that the VE was credible and the number of jobs he cited was significant.  (Tr. 22).

Having considered the arguments of the parties, and having reviewed the ALJ's decision and the administrative record as a whole, the undersigned cannot confidently say that the ALJ's specification in his RFC determination that plaintiff could have "no" changes in the work setting is consistent with the VE's testimony that it was impossible to predict when there would be a change in work setting, and characterizing changes in work setting as unforeseeable.

The undersigned doubts that the ALJ truly intended to impose a limitation as impractical as requiring absolutely no changes whatsoever in the work setting.  The undersigned also notes that this plaintiff's case is most definitely not one in which it would be appropriate to direct an award of benefits.  However, in the series of hypothetical questions posed to the VE, the ALJ drew very clear distinctions between "occasional" and "no" changes in work setting and, even though the VE testified that it was unpredictable and unforeseeable that there would be "no" changes, the ALJ specified "no" changes in work setting in his decision without first seeking clarification from the VE.  The fact that the ALJ paid close attention to the distinction during the hearing, but nonetheless repeatedly specified "no" changes in his opinion, defies the conclusion that the ALJ's use of the word "no" was a

mere scrivener's or typographical error. Remand is therefore appropriate to allow for clarification on this issue.

      C.    <u>Simple Work</u>

      Plaintiff alleges additional inconsistency between the ALJ's limitation of plaintiff to "simple" work and the fact that all of the jobs the VE identified have a specific vocational preparation ("SVP") level of two. For his argument, plaintiff notes the jobs of housekeeper/cleaner, hand packager, and mail room clerk, and notes that each job has an SVP level of two. Plaintiff then states "this is not simple work" and concludes "[t]herefore, although the ALJ found Plaintiff is limited to simple work, the VE did not provide any "simple" jobs according to the DOT." (Docket No. 11 at 15).

      Plaintiff appears to rest his conclusion that jobs with an SVP of two are not simple upon the DOT's specification that they require preparation beyond a short demonstration up to and including one month. Plaintiff does not, however, offer any authority or analysis tending to show that such a preparation requirement means the jobs in question cannot be defined as simple, and instead merely lists the jobs identified by the VE and concludes "[t]his is not simple work." (<u>Id.</u>) Plaintiff does, however, note that "SVP of 1 is simple work." (<u>Id.</u>)

      "According to the regulations, unskilled work 'needs little or no judgment to do simple duties that can be learned on

the job in a short period of time.'" <u>Hulsey v. Astrue</u>, 622 F.3d 917, 922-23 (8th Cir. 2010) (citing 20 C.F.R. § 416.968(a)). Unskilled work is the "least complex type of work." <u>Id.</u> (citing SSR 82-41, 1982 WL 31389 (1982)). Unskilled work corresponds to a SVP level of one or two. SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000); <u>see also Hulsey</u>, 622 F.3d at 923 (citing same).

As plaintiff himself acknowledges in his brief, an SVP level of one corresponds to simple work. As noted above, unskilled work is the least complex type of work, and it corresponds to a SVP of one or two. <u>Hulsey</u>, 622 F.3d at 922-23; SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000). Furthermore, as the Commissioner notes, a person who performs a job with an SVP level of two gains no work skills, further indication that the work is simple. <u>See</u> 20 C.F.R. §§ 404.1568(a), 416.968(a). Because plaintiff made no attempt to develop his argument on this point past the aforementioned conclusory statements, the undersigned declines to consider the issue further. <u>See SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases holding that merely perfunctory, undeveloped arguments are deemed waived).


Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 28 U.S.C. § 405(g), the Commissioner's decision be reversed and

the cause remanded for proceedings consistent with the foregoing.

The parties are advised that they have until July 20, 2011 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of July, 2011.